UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

TIMOTHY P. JANUSZ,

Petitioner,

v.

ROB MUNDT, Warden,

Respondent.

Civil File No. 01-1756 (DWF/AJB)

**REPORT AND RECOMMENDATION**

Timothy P. Janusz, Federal Correctional Institution -- Waseca, P.O. Box, 1500, Waseca, Minnesota, 56093, Petitioner, pro se.

Patricia R. Cangemi, Assistant U.S. Attorney, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota, 55415, for Respondent.

ARTHUR J. BOYLAN, United States Magistrate Judge

Petitioner commenced this action by filing an application for habeas corpus relief pursuant to 28 U.S.C. § 2241, claiming that Respondent is wrongly extending his confinement in federal prison. Respondent has filed an answer, contending that Petitioner is not entitled to habeas corpus relief, and that this action should be dismissed.

The matter has been referred to the undersigned for report and recommendation under 28 U.S.C. § 636 and Local Rule 72.1(c). For the reasons discussed below, it will be recommended that the petition be dismissed with prejudice.

## I. BACKGROUND

In 1996, Petitioner was convicted in the U.S. District Court for the District of Colorado on seven counts of wire fraud. He was sentenced to 63 months in prison, to be followed by a three-year term of supervised release. He also was ordered to pay restitution in the amount of $184,530.70.

MAR - 5 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

In January 1998, Petitioner escaped from the Federal Prison Camp at Yankton, South Dakota. He fled the country and went to the island of St. Maarten in the Netherlands Antilles. He was apprehended there in March 1999 -- more than year after his escape. An extradition proceeding was initiated, and Petitioner remained free on bond for part of the time when that proceeding was pending. In October 1999, an extradition order was entered, which directed that Petitioner be returned to the United States.

The extradition order in Petitioner's case stipulates that he cannot be punished or prosecuted in this country for acts committed prior to his extradition, unless either (a) he is given 30 days following the final completion of his current sentence to leave the United States again, or (b) American prosecutors receive approval from the Netherlands Antilles. In other words, the extradition order allows the United States to enforce Petitioner's previously-imposed 63-month prison sentence, but it prohibits the United States from prosecuting or punishing Petitioner for his escape (or any other pre-extradition offense) unless he is first given a chance to leave the country again, or the extraditing country expressly authorizes some further prosecution or punishment. Petitioner and Respondent apparently agree that Petitioner's 30-day window of opportunity to leave the country again will begin after he has completed his three-year term of supervised release. If he does not leave the country during that 30-day period, he could, presumably, be prosecuted for his escape.

Soon after the extradition order was entered, Petitioner was back in the United States. Upon his arrival in this country, Petitioner was taken into custody by the federal Bureau of Prisons, ("BOP"), and he was eventually assigned to the Federal Correctional Institution in Waseca, Minnesota, ("FCI-Waseca"). He has been confined at FCI-Waseca

since May 2000, serving the remainder of his original 63-month prison sentence.[1]

At some point after Petitioner arrived at FCI-Waseca, he began to explore the possibility of gaining an early release from prison pursuant to 18 U.S.C. § 3621(e)(2)(B). That statute provides that

> "[t]he period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be more than one year from the term the prisoner must otherwise serve."

Petitioner tried to get into the § 3621(e)(2)(B) drug rehabilitation program so he could get his sentence reduced – possibly by as much as a year. In late December 2000, Petitioner was informed that he was eligible for both admission to the rehabilitation program and a possible sentence reduction. Petitioner started the program in February 2001, and he apparently completed it last November.

However, Petitioner's bid for an early release was blocked in May 2001, when he was informed that he would not be assigned to a Community Corrections Center, (also known as a "CCC" or a "half-way house"), during the last part of his prison term. Petitioner was denied CCC placement because Respondent Robert Mundt, the Warden at FCI-Waseca, determined that Petitioner was "flight risk" and would pose a "threat to the community."

---

[1] Shortly after his escape, (and before his re-apprehension and extradition), the BOP charged Petitioner with violating BOP regulations by leaving a federal prison camp without authorization. An "in abstentia" disciplinary hearing was held, and Petitioner was found guilty of escape. His punishment consisted of 27 days of lost good time credit, as well as 30 days of disciplinary segregation to be served upon his capture and return. Petitioner apparently served the disciplinary segregation sanction, but the good time forfeiture sanction has been vacated.

Under BOP regulations, an inmate who is ineligible for CCC placement is automatically ineligible for early release pursuant to § 3621(e)(2)(B). See 28 C.F.R. § 550.58(a)(1)(v). Therefore, by declaring Petitioner ineligible for CCC placement, Warden Mundt also took away Petitioner's chance for early release upon completion of his drug rehabilitation program.

When Petitioner learned that he would not be assigned to a CCC -- and, concomitantly, that he would not be granted an early release under § 3621(e)(2)(B) -- he began seeking relief through the BOP's administrative remedy process. See 28 C.F.R. §§ 542.10-.19. He initiated that process before he filed his current habeas corpus petition in September 2001. He did not fully exhaust his administrative remedies, however, until January 16, 2002 – long after he commenced the present action. In fact, the administrative remedy process was not completed until after Respondent had filed his Return and the issues in this case had been fully-briefed. Nevertheless, it now appears that Petitioner has fully exhausted his available administrative remedies, and he still has not been granted the relief he has been seeking.[2]

Thus, as matters now stand, Petitioner will not serve the last part of his prison term in a half-way house, and he will not be released from prison early pursuant to § 3621(e)(2)(B), even though he has successfully completed his drug rehabilitation program.

---

[2] Before the administrative remedy process was completed, Respondent argued that this action should be dismissed because Petitioner had failed to fully exhaust all available administrative remedies. Because it now appears that Petitioner has, in effect, "cured" his non-exhaustion problem, the Court will consider the merits of his claims. See Leighnor v. Turner, 884 F.2d 385, 388 (8th Cir. 1989) (declining to dismiss appeal on exhaustion grounds where prisoner exhausted his administrative remedies while his case was still pending).

Instead, Petitioner is expected to remain in prison until his projected release date, which is February 1, 2003.

## II. PETITIONER'S CLAIMS

Petitioner's ultimate objective in this action is an early release from prison pursuant to 18 U.S.C. § 3621(e)(2)(B). He obviously recognizes, however, that his hopes for an early release are dependent on CCC placement. He knows that the BOP's regulations will keep him from getting an early release under § 3621(e)(2)(B), as long as he remains ineligible for CCC placement. If Petitioner were assigned to a half-way house, an early release under § 3621(e)(2)(B) presumably would follow. Therefore, even though Petitioner is seeking early release under § 3621(e)(2)(B), his arguments are focused primarily on Respondent's decision not to place him in a half-way house.

Petitioner is challenging Respondent's CCC decision on three separate grounds. He first contends that Respondent abused his statutory discretion by declaring him ineligible for CCC placement. He further contends that Respondent violated his constitutional right to due process by deciding that he would not be given CCC placement. Finally, Petitioner contends that barring him from CCC placement is a form of "punishment" that is prohibited by his extradition order. For the reasons discussed below, the Court rejects all three of Petitioner's arguments.

## III. DISCUSSION

### A. Abuse of Discretion Claim

The federal statute governing CCC assignments is 18 U.S.C. § 3624(c). This statute provides as follows:

> "**Pre-release custody**. The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during such pre-release custody."

Federal courts have consistently recognized that § 3624(c) does not mandate CCC placement; it merely gives the BOP the discretionary authority to assign inmates to half-way houses. United States v. Laughlin, 933 F.2d 786, 789 (9th Cir. 1991) ("[n]othing in the language of section 3624(c) mandates that all prisoners pass through a community treatment center en route to free society"); Prows v. Federal Bureau of Prisons, 981 F.2d 466, 469 (10th Cir. 1992) ("[n]othing in § 3624(c) indicates any intention to encroach upon the [BOP's] authority to decide where the prisoner may be confined during the pre-release period"), cert. denied, 510 U.S. 830 (1993); Flisk v. United States Bureau of Prisons, No. 92 C 1203 (N.D.Ill. 1992), 1992 WL 80523 at *1 ("[i]n some cases [CCC] placement is completely inappropriate... prison administrators appear to enjoy a good deal of freedom"); United States v. Lopez-Salas, 266 F.3d 842, 849 (8th Cir. 2001) ("[t]he 'to the extent practicable' language in the statute gives the BOP some measure of discretion in assigning inmates to a half-way house during the last portion of their incarceration").

Petitioner does not appear to be contending that Respondent is statutorily obligated to assign him to a half-way house; he apparently recognizes that CCC placement is purely discretionary. Instead, Petitioner seems to be arguing that Respondent abused his statutory discretion by declaring him ineligible for CCC placement. Respondent counters this abuse-of-discretion argument by citing 18 U.S.C. § 3625, which prohibits federal courts

from reviewing BOP decisions on prisoner housing matters covered by 18 U.S.C. §§ 3621-3626.[3] Respondent claims that § 3625 precludes this Court from reviewing his decision to deny CCC placement for Petitioner.

Respondent's § 3625 argument is supported by Lyle v. Sivley, 805 F.Supp. 755 (D.Ariz. 1992). In that case, as in this one, a federal prisoner claimed that he had "illegally been denied placement in a Community Corrections Center." Id. at 756. Although the prisoner's "unit team" recommended that the prisoner should be assigned to a half-way house for sixty days, the warden rejected that recommendation because of "the seriousness of the crime(s) [that the prisoner] committed." Id. at 757. The prisoner sought judicial review of the warden's decision, contending that it was "arbitrary, capricious and politically motivated," and "deprived him of a constitutionally protected liberty interest without due process." Id. at 757-58. The warden in Lyle countered the prisoner's arguments by citing § 3625 -- just as the instant Respondent has done in the present case.

After carefully examining the legislative history of § 3625, the Lyle court found "conclusive proof that Congress indeed intended that determinations made pursuant to section 3624(c) not be reviewable." Id. at 759. The court accepted the warden's argument, explaining that –

> "In light of the overwhelming evidence of congressional intent, this Court concludes that in enacting section 3625, Congress intended to 'carve out' an area of decision making committed solely to agency discretion and not subject to judicial review."

Id. (emphasis added).

---

[3] Section 3625 states that "[t]he provisions of sections 554 and 555 and 701 through 706 of title 5, United States Code, do not apply to the making of any determination, decision, or order under this subchapter."

The Lyle court ultimately held that a BOP decision regarding a prisoner's CCC placement is subject to judicial review only when the prisoner claims that the BOP "has violated the constitution or acted 'beyond the scope of discretion granted by Congress.'" Id. at 760 (citation omitted). This means that "a 'bare allegation' that [the warden] has abused his discretion is insufficient to support jurisdiction." Id.

In Martin v. Gerlinski, 133 F.3d 1076 (8th Cir. 1998), the Eighth Circuit Court of Appeals agreed with Lyle's interpretation of § 3625. While holding that § 3625 does not bar federal judicial review of the BOP's "rulemaking decisions," our Court of Appeals specifically pointed out that "§ 3625 precludes judicial review of agency adjudicative decisions." Id. at 1079 (emphasis added). In other words, federal courts can properly review BOP rules and regulations (implementing and enforcing the statutory directives of §§ 3621-3626) to ensure that they follow the statutes; but the courts cannot review discretionary CCC placement decisions in individual cases.

In this case, Petitioner is not challenging the validity of any rule or regulation adopted by the BOP; he is simply claiming that Respondent should have exercised his discretion differently in his particular case. That claim cannot be entertained here, however, because, according to Martin, "§ 3625 precludes judicial review of agency adjudicative decisions." Id.

The Court recognizes that Petitioner is contending that Respondent not only abused his discretion, but also failed to follow the BOP's own guidelines covering CCC placement decisions.[4] Even with this additional argument, however, Petitioner still cannot overcome

---

[4] Petitioner alleges that Respondent did not follow BOP policy statement # 7310.04, which purportedly indicates that CCC placement will not ordinarily be appropriate for

Respondent's § 3625 defense. Whether Petitioner characterizes his claim as abuse of discretion or misapplication of BOP guidelines, he is still challenging an "adjudicative decision," rather than a "rulemaking decision," and his claim is therefore barred by § 3625.

In sum, based on Lyle v. Sivley, and the tacit approval of Lyle in Martin v. Gerlinski, the Court concludes that § 3625 precludes judicial review of Respondent's discretionary determination that Petitioner should not be assigned to a half-way house. Respondent's decision was a proper exercise of the discretion given by Congress in § 3624(c), and this Court cannot properly second-guess that decision.[5]

B. Due Process Claim

Petitioner also claims that Respondent violated his constitutional right to due process by denying him the chance to go to a half-way house. This claim is not barred by § 3625, because "even where Congress has sought to preclude judicial review of agency action, a federal court may review colorable constitutional claims." Lyle, 805 F.Supp. at 760. Petitioner's due process claim still must be rejected, however, because it simply is not sustainable.

---

inmates who have "a history of repetitive violence, escape, or association with violent or terrorist organizations." (Petitioner's Memorandum In Support Of Petition For Writ Of Habeas Corpus [etc.]," [Docket No. 2], at p. 21.) Petitioner apparently believes that the word "repetitive" is intended to modify both "violence" and "escape." However, the BOP may have intended the word "repetitive" to modify only "violence," thereby implying that a single incident of escape would ordinarily foreclose CCC placement. In any event, the policy statement is not intended to be a set of rigid rules. It provides some general guidance to decision-makers, but it clearly contemplates that prison wardens will exercise their discretion as they see fit, based on each individual inmate's unique situation as reflected in his or her entire record.

[5] The Court would not be inclined to second-guess Respondent's decision on Petitioner's CCC placement even if that could properly done. Given Petitioner's history of escape and flight to a foreign country, Respondent's decision is fully understandable.

To succeed on a due process claim, a prisoner must show that he has been deprived of some constitutionally protected property or liberty interest. Ragan v. Lynch, 113 F.3d 875, 876 (8th Cir. 1997) ("[a] due process claim is cognizable only if there is a recognized liberty or property interest at stake"). In this case, Petitioner has not alleged that he has been deprived of any property interest, so he must be claiming that there is some constitutionally protected liberty interest at stake here. And the only potential liberty interest on which Petitioner's due process claim could be based is his interest in being assigned to a half-way house for the last part of his prison sentence.

It is clear, however, that Petitioner does not have a constitutionally protected liberty interest in going to a half-way house. In fact, Petitioner has conceded as much when he says that he "does not contend that he has a liberty interest, or entitlement to half-way house placement that must be preserved by imposing procedural safeguards." (Petitioner's Memorandum, [Docket No.2], p. 17.) Furthermore, federal case law confirms that Petitioner does not have a liberty interest in CCC placement pursuant to 18 U.S.C. § 3624(c). See Lyle, 805 F.Supp. at 761 ("section 3624(c) does not create a protected liberty interest"); Flisk, 1992 WL 80523 at *2 (a federal prisoner has no "protectible liberty interest arising out of § 3624(c)"); Gambino v. Gerlinski, 96 F.Supp.2d 456, 459-60 (M.D.Pa.) (agreeing with the "conclusion unanimously reached" by other courts that "§ 3624(c) does not create a liberty interest"), aff'd 216 F.3d 1075 (3rd Cir. 2000).

Petitioner seems to believe, however, that he can sustain his due process claim, even though no protected liberty interest is at stake, merely because Respondent's decision denying CCC placement was (supposedly) "arbitrary" and "capricious." He argues that a critical function of due process is to protect citizens from arbitrary and capricious

decisions by government officials. That broad assertion is undoubtedly true. See Wolff v. McDonnell, 418 U.S. 539, 558 (1974) ("[t]he touchstone of due process is protection of the individual against arbitrary action of government"). Petitioner is mistaken, however, if he thinks he is entitled to the protections of due process anytime his life is affected by any decision of a prison official. That is simply not the case. As the Court has already pointed out, the protections of due process are required only when a constitutionally protected interest is affected by a government official's decision. See Ragan, supra; see also Olim v. Wakinekona, 461 U.S. 238, 250 (1983) ("[p]rocess is not an end in itself[;] [i]ts constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement").

Petitioner seems to believe that a prisoner can invoke the due process clause whenever a prison official's decision appears to be arbitrary and capricious. If that were the case though, then every BOP action or decision – no matter how mundane or inconsequential – would be subject to judicial review on due process grounds. If, for example, an inmate did not like the color of his prison apparel, he could bring a due process claim, arguing that the color had been chosen "arbitrarily." In truth, of course, prison officials make administrative decisions affecting inmates' lives every day, and most of those decisions are not subject to judicial review on due process grounds, no matter how "arbitrary" they might be. Even relatively important decisions, such as prison housing assignments, are not normally subject to judicial review simply because they are alleged to have been made arbitrarily. Olim, 461 U.S. at 250 (prison authorities "may transfer a prisoner 'for whatever reason or for no reason at all'"), quoting Meachum v. Fano, 427 U.S. 215, 228 (1976). Again, as long as there is no constitutionally protected interest at stake,

the due process protections against arbitrary governmental decision-making are simply not applicable. See Singleton v. Cecil, 176 F.3d 419, 424 (8th Cir.) ("'the possession of a protected life, liberty, or property interest is... a condition precedent' to any due process claim... [and] [m]erely labeling a governmental action as arbitrary and capricious, in the absence of the deprivation of life, liberty, or property, will not support a substantive due process claim"), cert. denied, 528 U.S. 966 (1999), quoting Movers Warehouse, Inc. v. City of Little Canada, 71 F.3d 716, 718 (8th Cir. 1995).

If the instant Petitioner had a liberty interest in CCC placement, then the due process clause would protect him from being deprived of that interest by an arbitrary decision. In fact, however, Petitioner does not have a protected liberty interest in being assigned to a half-way house pursuant to § 3624(c), and he therefore has no basis for bringing a due process claim.[6]

C. Extradition Order Claim

Finally, Petitioner claims that the terms of his extradition order preclude Respondent from denying CCC placement. Petitioner was extradited to this country for the limited purpose of finishing his previously-imposed prison sentence. The order effecting his extradition expressly forbids American officials from prosecuting or punishing Petitioner for any other pre-extradition conduct, including his escape from prison. Petitioner now contends that Respondent is violating the extradition order by denying him CCC placement, because that denial is a "punishment" that is proscribed by the order.

---

[6] It should be noted once again that record does not support Petitioner's contention that he was "arbitrarily" denied CCC placement. Respondent offered a good reason for denying CCC placement – namely that Petitioner poses a significant "flight risk" given his history of escaping, fleeing to a foreign country, and remaining a fugitive for over a year.

To resolve Petitioner's extradition order claim, the Court looks to Leighnor v. Turner, 884 F.2d 385 (8th Cir. 1989). In that case, a prisoner named Leighnor escaped from a federal prison and fled to Germany. He was apprehended there and returned to the United States pursuant to an extradition treaty. The treaty included a clause referred to as the "Rule of Specialty," which was virtually identical to the "no additional punishment" clause at issue here. Id. at 388-89.[7] The Rule of Specialty clause prohibited the United States from "proceed[ing] against" Leighnor "for any offense committed prior to his surrender other than that for which he was extradited." The same clause further stated that Leighnor could not be "restricted in his personal freedom" without either (a) obtaining the consent of the extraditing country, or (b) giving Leighnor a 45-day opportunity, after the end of his uncompleted sentence, to leave the country again. Id.

After Leighnor returned to the United States, the federal Parole Commission

> "informed Leighnor that his parole release guideline range of 26-34 months was being increased to 46-66 months in order to take into account 'new criminal behavior' – namely, his escape from federal prison and his use of a false passport in the course of that escape."

Id. at 387. In effect, the Parole Commission decided that Leighnor would be kept in prison for at least an extra year because of his escape. Leighnor predictably argued that the Parole Commission's decision was proscribed by the Rule of Specialty clause, which was

---

[7] The Eighth Circuit noted that

> "[t]he rule of specialty is based on principles of international comity and is designed to guarantee the surrendering nation that the extradited individual will not be subject to indiscriminate prosecution by the receiving government."

Leighnor, 884 F.2d at 389.

an essential and non-violable element of the extradition process. The Court of Appeals rejected Leighnor's argument, concluding that the Rule of Specialty clause in the extradition treaty did not "preclude the receiving government from taking any pre-extradition conduct into account when making parole decisions" even when "the receiving government's use of the pre-extradition offense affect[s] the defendant's sentence." Id. at 390. The Court further noted that Rule of Specialty clauses are

> "generally understood to prohibit indiscriminate prosecution of extradited individuals rather than to prohibit the receiving state's consideration of pre-extradition offenses while prosecuting the individual for crimes for which extradition was granted."

Id. (emphasis in the original).

Leighnor is very similar to the present case. Here, as in Leighnor, a federal prisoner escaped, left the country, and was returned by extradition. The extradition treaty in Leighnor, like the extradition order in this case, prohibited American officials from prosecuting or punishing the returned prisoner for pre-extradition conduct, including his escape. Yet in both cases the returned prisoner did suffer adverse consequences as a result of his escape. In Leighnor, the prisoner was kept in prison longer because his parole was delayed for at least a year; in the present case, Petitioner will be kept in prison longer because he has been denied the opportunity to go to a half-way house. Petitioner here makes the same argument that Leighnor made – namely that the terms and conditions of his extradition prohibit American officials from extending his imprisonment because of his escape. That argument was rejected by the Court of Appeals in Leighnor, and it must be rejected here as well.

Based on Leighnor, this Court concludes that Petitioner's extradition order was only intended to bar "indiscriminate prosecution" for new offenses. It was not intended to prevent prison officials from considering Petitioner's pre-extradition conduct, including his escape, for purposes of punishing the crime for which he was extradited. In other words, the extradition order prohibits American officials from prosecuting Petitioner for any new crimes, or imposing any new sentence or punishment against him, for pre-extradition offenses, but American officials can still consider Petitioner's pre-extradition conduct for purposes of implementing and enforcing the sentence that caused his extradition. Here, as in Leighnor, the terms and conditions of the extradition do not affect where the returned prisoner will serve the balance of his original sentence. The returned prisoner can still be required to serve his sentence in prison, rather than on parole (as sought by Leighnor), or in a half-way house (as sought by Petitioner). Thus, the Court concludes that Respondent has not violated the extradition order by deciding that Petitioner must serve all of his original sentence in prison.

## IV. CONCLUSION

For the reasons discussed above, Respondent's decision denying CCC placement for Petitioner will not be second-guessed and overturned in this proceeding. It follows that Petitioner remains ineligible for a reduced sentence pursuant to § 3621(e)(2)(B). See Smith v. Reese, Civil No. 00-2471 (ADM/JMM) (D.Minn. 2001), 2001 WL 530548 at *2 ("it is reasonable for the BOP's regulation... to exclude from early release categories of inmates who are ineligible for a community-based program, such as CCC"); Rublee v. Fleming, 160 F.3d 213, 216 (5th Cir. 1998) (the BOP "has the authority to make § 3621(e)(2)(B) early release contingent upon the fulfillment of the community-based

treatment requirement"). The Court will therefore recommend that Petitioner's application for a writ of habeas corpus be denied, and that this action be dismissed with prejudice.

## V. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Petitioner's application for a writ of habeas corpus, (Docket No. 1), should be DENIED; and

2. This action should be DISMISSED WITH PREJUDICE.

DATED: March 4th, 2002

Arthur J. Boylan

ARTHUR J. BOYLAN
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this report and recommendation by filing with the Clerk of Court and serving all parties, within ten days after being served with a copy thereof, written objections which specifically identify the portions of the proposed findings, recommendations or report to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief with ten days after service thereof. All briefs filed under this rule shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.